1

2

3

4                                                    **E-FILED on    7/16/08    **

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                            SAN JOSE DIVISION

11

**United States District Court**
For the Northern District of California

| | |
|---|---|
| 12  CG ROXANE LLC, | No. C-07-02258 RMW |
| 13            Plaintiff, | |
| 14      v. | ORDER GRANTING DEFENDANTS'<br>MOTION FOR SUMMARY JUDGMENT |
| 15  FIJI WATER COMPANY LLC; FIJI WATER<br>COMPANY HOLDINGS LLC; | |
| 16  PARAMOUNT INTERNATIONAL EXPORT,<br>LTD; and DOES 1-20, | **[Re Docket No. 37]** |
| 17            Defendants. | |
| 18 | |

19

20          Defendants Fiji Water Company LLC, Fiji Water Company Holdings LLC and Paramount

21  International Export Ltd. (collectively "defendant") move for summary judgment on the claims

22  asserted by plaintiff CG Roxane LLC ("plaintiff") and on their counterclaim for cancellation of the

23  plaintiff's trademark.  For the reasons set forth below, the court GRANTS defendant's motion.

24                            **I.  BACKGROUND**

25          Plaintiff CG Roxane manufactures, markets and sells Crystal Geyser bottled water. Plaintiff

26  began using the phrase "Bottled at the Source" on its bottles in 1990.  Plaintiff's water bottles are

27  cylindrical in shape with mountains behind a blue label and a red ribbon bearing the trademark

28  BOTTLED AT THE SOURCE across the top.  In 2002, plaintiff applied with the United States

Patent and Trademark Office ("USPTO") to trademark the phrase but was initially refused

United States District Court
For the Northern District of California

1   registration on the grounds that the phrase "merely described the goods."  Decl. Page Beykpour

2   ("Beykpour Decl."), Ex. G (official USPTO Office Action).  Plaintiff submitted a response to the

3   office action citing "substantially exclusive and continuous use," marketing efforts and sales success

4   as evidence of the mark's acquired secondary meaning.  *Id.*, Ex. H (response to USPTO Office

5   Action).  The mark was published in the Official Gazette on August 12, 2003.  *Id.*, Ex. I.  The

6   USPTO ultimately granted "Bottled at the Source" a registration number, 2779047, on November 4,

7   2003.  *Id.*, Ex. J.

8        Defendant Fiji Water Company is also in the bottled water industry.  Defendant began using

9   the phrase "Bottled at Source" in 1997, initially on the front label of its water and, since 2005, on the

10  back label.  Defendant's water bottles are generally square in shape with a tropical flower

11  surrounding the logo on the front of the bottle.  The back label has a blue banner with white lettering

12  reading "Bottled at Source" toward the bottom half of the bottle near the mineral composition chart.[1]

13       The present dispute began in 2006 when plaintiff sent a cease and desist letter to defendant

14  and defendant refused to stop its current packaging and advertising using "Bottled at Source."

15  Beykpour Decl., Ex. K.  In response, plaintiff filed this lawsuit alleging federal trademark

16  infringement as well as claims for state and federal unfair competition, trademark dilution, injury to

17  business reputation, conversion, interference, false advertising, and negligent or intentional

18  misrepresentation.  Defendant counterclaimed for cancellation of the trademark based on lack of

19  distinctiveness.  On April 28, 2008, defendant filed the instant motion for summary judgment on all

20  of plaintiff's claims and its counterclaim.

21                              **II.  ANALYSIS**

22       **A.     Trademark Validity**

23       Plaintiff alleges that defendant's use of "Bottled at Source" constitutes infringement of its

24  registered trademark "Bottled at the Source" in violation of the Lanham Act, 15 U.S.C. § 1114.  For

---

[1]  On June 2, 2008, plaintiff submitted a number of objections to the evidence presented by
defendant in support of its motion for summary judgment.  The court will address these objections
where pertinent to the discussion below.  One of these objections, no. 25, is that defendant submitted
two physical exhibits, 500 ml bottles of Crystal Geyer and Fiji Water, on May 6, 2008, which was
11 days after defendant initially filed its motion for summary judgment.  Defendant timely submitted
photos of these bottles and there does not appear to be any dispute that the bottles of water are what
defendant says they are.  Plaintiff's timeliness objection is overruled.

a plaintiff to successfully assert a trademark infringement claim under § 1114 of the Lanham Act, it must first show that it has a valid mark and next that the defendant's use of the mark is "likely to cause confusion, or to cause mistake, or to deceive" the consumer. 15 U.S.C. § 1114(1)(a). Validity of the trademark is a threshold question since "[a] necessary concomitant to proving infringement is, of course, having a valid trademark; there can be no infringement of an invalid mark." *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002).

A trademark is a "symbol affixed by the manufacturer . . . to a vendible product, which designates and distinguishes such product and protects the manufacturer's good will, existing because of his business and the quality of his product." *Pac. Supply Co-op. v. Farmers Union Cent. Exch. Inc.*, 318 F.2d 894, 905 (9th Cir. 1963). Prospective marks are placed in one of five categories (fanciful, arbitrary, suggestive, descriptive and generic) based on distinctiveness that determine what level of protection the mark receives. *KP Permanent Make-Up, Inc. v. Lasting Impression I., Inc.*, 408 F.3d 596, 602 (9th Cir. 2005).

Arbitrary, fanciful and suggestive marks automatically receive trademark protection because they are considered inherently distinctive since they identify a product's source and not the product itself. *KP Permanent Make-Up*, 408 F.3d at 605; 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:1 (4th ed. 2008). "The distinctiveness or 'strength' of a mark measures its capacity to indicate the source of the goods or services with which it is used." *Rest (Third) of Unfair Competition* § 21, cmt. i (1995). The stronger or more distinctive a mark, the more likely it is that consumers will associate that specific manufacturer with other goods bearing the same mark. *Id.* It is because of this association that arbitrary, fanciful and suggestive marks receive a high degree of protection. *Id.* Inversely, descriptive and generic marks lack this association and are not afforded trademark protection. *Id.*

Descriptive marks can be trademarked if they acquire secondary meaning and are therefore distinctive. *Filipino Yellow Pages, Inc. v. Asian Journal Publi'n, Inc.*, 198 F.3d 1143, 1147 (9th Cir. 1999). Generic marks can never be trademarked since they only identify what the product is. *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 927 (9th Cir. 2005).

United States District Court
For the Northern District of California

1    Registration of the mark with the USPTO is prima facie evidence of its validity. *Tie Tech*,

2    296 F.3d at 782. Once the party challenging the mark's validity shows sufficient evidence to

3    overcome this presumption by a preponderance of the evidence, the burden shifts to the certificate

4    holder to prove validity. *Anti-Monopoly, Inc. v. Gen. Mills Fun Group, Inc.*, 684 F.2d 1316, 1319

5    (9th Cir. 1982).

6          **1.    Genericness of "Bottled at the Source"**

7    Defendant contends that "Bottled at the Source" is a generic mark and thus unprotectable.

8    Generic marks "give the general name of the product; they embrace an entire class of products" and

9    receive no trademark protection. *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d

10   1042, 1047 (9th Cir. 1998). Generic marks tend to describe the general category, type or class of

11   goods of the product. *Rest (Third) of Unfair Competition* § 15 (1995). To determine genericness,

12   courts often refer to the "who-are-you/what-are-you" test. *Filipino Yellow Pages,* 198 F.3d at 1147

13   (quoting *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1391 (9th Cir. 1993)). A valid trademark

14   answers the former question while a generic mark answers the latter question. *Id.* "If the primary

15   significance of the trademark is to describe the *type of product* rather than the *producer*, the

16   trademark [is] a generic term and [cannot be] a valid trademark." *Filipino Yellow Pages,* 198 F.3d at

17   1147 *(*quoting *Anti-Monopoly, Inc. v. Gen. Mills Fun Group*, 611 F.2d 296, 304 (9th Cir. 1979))

18   (emphasis in original).

19   Generic adjectives are not protected either since they describe a characteristic of a class of

20   products such as "disinfectable" nail files, "light beer" and "brick oven" pizza. *Rudolph Int'l, Inc. v.*

21   *Realys, Inc.*, 482 F.3d 1195, 1198 (9th Cir. 2007); *Miller Brewing Co. v. G. Heileman Brewing Co.,*

22   *Inc.*, 561 F.2d 75, 80 (7th Cir. 1977); *Schwan's IP, LLC  v. Kraft Pizza Co.*, 460 F.3d 971, 973 (8th

23   Cir. 2006). Allowing a producer to trademark a generic word or phrase would place an undue

24   burden on competition contrary to the goals of trademark law and is therefore prohibited. *Intel*

25   *Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 618 (9th Cir. 1993); *Door Sys., Inc. v. Pro-Line Door Sys.,*

26   *Inc.*, 83 F.3d 169, 171 (7th Cir. 1996). However, since plaintiff's mark is registered, it is important

27   to note that "[r]egistered marks are endowed with a strong presumption of validity" against

28

United States District Court
For the Northern District of California

1  genericness and the defendant has the burden of overcoming this presumption to prove the mark's

2  genericness.  *Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1135 (9th Cir. 2006).

3          One criterion used to determine when a mark is generic is whether the primary significance

4  of the mark is the product itself or the source of the product.  *Rudolph*, 482 F.3d at 1198 ("[I]f the

5  primary significance of the trademark is to describe the type of *product* rather than the *producer*, the

6  trademark is a generic term and cannot be a valid trademark." (citing *Filipino Yellow Pages*, 198

7  F.3d at 1147)) (emphasis in original).  "A generic designation is, in one sense, simply 'the ultimate in

8  descriptiveness' because it is necessary for producers to use that term to inform consumers about the

9  nature and identity of their goods."  *Classic Foods Int'l Co. v. Kettle Foods, Inc.*, 468 F. Supp. 2d

10 1181, 1194 (C.D. Cal. 2007) (citing 2 McCarthy §12:20).  It appears that plaintiff's mark suffers

11 from this deficiency: "bottled at the source" describes a type of water that is manufactured or bottled

12 at the source as opposed to bottled from a tap or municipal source.  It does not indicate the source of

13 the bottled water.

14         Courts look to other sources to determine genericness such as whether competitors use the

15 mark, use by the media and the plaintiff's own use of the mark.  *Classic Foods*, 468 F. Supp. 2d at

16 1189-91.  Courts view a mark's use by competitors as "strong evidence of how the public perceives

17 the term."  *Id.* at 1190.  Naturally, when more members of the public see a mark used by several

18 producers in the industry, the less likely they will identify a particular producer with that mark.  *Id.*

19         In *Classic Foods*, the Central District of California, examining the genericness of "kettle

20 chip," looked at several competitors who used the term "kettle" both in their name, as a category of

21 potato chip and in describing the cooking process for their product.  *Id.* at 1191.  The court stated

22 that "when consumers see 'kettle' linked directly to the cooking process by several companies, they

23 are informed that a kettle chip is a potato chip that has . . . been [ ] cooked in a kettle" and "does not

24 help identify the source of the product."  *Id.*  The court concluded that the term "kettle" was a type of

25 chip as well as the name of a process of making chips and was not associated with any one source.

26 *Id.* at 1194.  "Kettle chip" lacked distinctiveness, classifying it as generic and therefore ineligible for

27 trademark protection.  *Id.*

28

United States District Court
For the Northern District of California

1    Similarly in *Schwan's*, the Eighth Circuit determined that the mark "brick oven" could not be

2    trademarked in reference to pizza because four competitors used the phrase concurrently with the

3    plaintiff. *Schwan's*, 460 F.3d at 973. Even though the plaintiff used the term exclusively when it

4    began making brick oven pizzas, the term had become popular among competitors. *Id.* In *Schwan's*,

5    the plaintiff admitted in its USPTO application that "brick oven" refers to a pizza with specific

6    qualities such as crispiness and a soft interior crust attained from a unique baking process. *Id.* Since

7    the mark referred to a type of pizza and not a producer, the court determined that it was generic. In

8    the case at hand, the USPTO recognized a similar problem in plaintiff's original application for

9    registration of its mark "Bottled at the Source." The examiner stated that the plaintiff "merely

10   combined individually descriptive terms which tells the consuming public information about the

11   goods" and that "examination of the specimens further demonstrates the point." Beykpour Decl., Ex.

12   G (official USPTO Office Action).

13   In considering usage by competitors, the evidence weighs in favor of the defendant that the

14   mark "bottled at the source" is generic. Defendant provided a substantial amount of evidence

15   regarding competitors' use of plaintiff's mark, including almost two dozen competitors using the

16   mark on their bottles. Decl. Mark Campbell ("Campbell Decl."), Ex. C at 35-95.[2] Defendant also

17   provided documents showing fifty other bottled water companies that use the phrase "bottled at the

18   source" to describe their products to consumers in websites, advertisements and marketing. *Id.*, Ex.

19   G at 104-214. Plaintiff correctly points out that some of these companies do not sell water in the

20   United States. Opp'n at 7-8. A term's primary significance is determined by "a usual buyer or other

21   relevant members of the public" such as retail consumers in the parties' domestic markets. *H.*

22   *Marvin Ginn Corp. v. Int'l Assoc. of Fire Chiefs, Inc.*, 782 F.2d 987, 989 (Fed. Cir. 1986). Even

23   discounting those products that do not appear to be sold in the United States, defendant has still

24   proven that at least 70 competitors use the phrase "bottled at the source." This evidence of use by

25

26   [2] Plaintiff objects to the photographs of bottled water contending that no foundation has been laid.
     The court overrules this objection. Defendant has sufficiently established that the photographs are

27   of bottles of water acquired between February and April 2008 and were taken at the direction of
     Mark Campbell. Campbell Decl. ¶ 4. Plaintiff's additional objection that the exhibit does not reflect

28   the perception of American consumers is a legal argument to the merits of the import of the exhibit
     and is overruled. Plaintiff's similar objections to exhibits G - N are likewise overruled.

United States District Court
For the Northern District of California

competitors strongly suggests that the mark is generic, especially when compared to *Schwan's* evidence of four competitors and the evidence in *Classic Foods* of ten competitors using the disputed marks. *Schwan's*, 460 F.3d at 973; *Classic Foods*, 468 F. Supp. 2d at 1191.

The disputed mark in this case is very similar both to "kettle chips" and "brick oven" pizza at issue in *Schwan's* and *Classic Foods*. "Bottled at the source" is a factual statement about the manufacturing process used to bottle water, a process that both plaintiff and defendant appear to employ. Beykpour Decl. ¶¶ 40-41; Decl. John Cochran ¶¶ 1-2. In *Classic Foods*, the term "kettle chips" described a type of potato chip that was cooked in a kettle thereby making it crispier than other chips. Here, the phrase "bottled at source" describes a manufacturing process that purports to be purer than other forms of bottled water. Cochran Decl. ¶ 3. Brick oven baked pizza similarly has distinct characteristics based on the mode of production (being baked in a brick oven) much like bottled water "from the source." *Schwan's*, 460 F.3d at 973.

Plaintiff attempts to differentiate between public use of the phrase "bottled at the source" in a general way and the public's use of the trademark to signify a type of bottled water. This distinction was not made in *Schwan's* or *Classic Foods*, but another trademark holder unsuccessfully made a similar argument in *Retail Services, Inc. v. Freebies Publ'g,* 364 F.3d 535, 547 (4th Cir. 2004). The defendant in *Retail Services* urged the court to enforce the trademark, stating that even though use of the word "freebie" was widespread, the defendant's FREEBIES mark was entitled to protection because the public did not use the word in the generic sense. *Id.* The court rejected this defense to genericness stating, "[i]n our view, this razor-thin distinction is not significant." *Id.* This court agrees that the distinction plaintiff attempts to draw is not significant.

In addition to examining usage of a term among competitors as indicative of genericness, courts often refer to the marks usage in "popular press as strong evidence of how the public perceives the term." *Classic Foods*, 468 F. Supp. 2d at 1189; *see also Filipino Yellow Pages*, 198 F.3d at 1151 (holding that a *Los Angeles Times* article referring to Filipino yellow pages in a generic sense was properly considered by the district court in determining that the mark was generic). Since the media often "[has] its finger on the pulse of the general public," its use of the mark may indicate the general understanding of the mark. *Classic Foods*, 468 F. Supp. 2d at 1189. "If consumers

repeatedly encounter a term used generically in the media, they will be much more likely to use the term generically themselves." *Id.*

The court in *Classic Foods* concluded that 37 articles referring to kettle chips in a generic sense was a strong indication of the mark's genericness. *Classic Foods*, 468 F. Supp. 2d at 1189. Articles from prominent publications such as the *New York Times* and *Los Angeles Times* referred to kettle chips as a genus of chips and not to a specific producer of the chip. *Id.* These articles referenced the several different companies making kettle chips and used the term to describe the cooking process as well. *Id.* at 1190. The court used this evidence to determine that the primary significance of "kettle chip" is to a product, not a producer. *Id.*

The *Schwan's* court looked at articles, newspapers and other restaurants using the term "brick oven" in a generic manner to grant summary judgment for the defendant and rule that the mark was generic. *Schwan's*, 460 F.3d at 974-75. Similarly, the Ninth Circuit in *Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*, 601 F.2d 1011, 1013 (9th Cir. 1979), determined that the district court correctly examined exhibits of "magazine and medical journal articles, letters and a television transcript" that used the term "surgicenter" to grant summary judgment that the mark was generic. *Id.*

Defendant provided approximately fifty examples of the media and popular press using the phrase "bottled at the source" to describe a type of water or a manufacturing process. Campbell Decl., Ex. H at 215-345. Defendant's evidence is similar to that in *Schwan's*, *Classic Foods* and *Surgicenter* wherein reputable press and media evidence was submitted to demonstrate genericness. Many of the articles use the mark in a sentence to describe a type of water and never refer to plaintiff's brand of water. *Id.* For example, a *New York Times* article discusses Mountain Valley Spring Water which is "bottled at the source in Hot Springs, Arkansas." *Id.* at 221. Another *Chicago Tribune* article references a bottled water industry consultant, Arthur von Wiesenberger, who believes that there are three main categories of bottled water: natural spring bottled at the source water, artesian water and tap water. *Id.* at 229. Referring to natural spring bottled at the source water, Wiesenberger says, "[t]his category of bottled water comes from a natural spring but it is not transported for bottling" and also calls it a "premium category" of water. *Id.*

**United States District Court**
For the Northern District of California

1    Although plaintiff challenges this evidence on the basis that some of the articles are

2    duplicates, this again leaves sufficient evidence to overcome a presumption of validity created by the

3    trademark registration.  Plaintiff once again argues that the media's use is not in a generic sense and,

4    for the reasons stated above, this distinction is unwarranted.  *Retail Services,* 364 F.3d at 547.

5    Defendant provided ample evidence to show that the media uses the phrase "bottled at the source" in

6    a way that refers to a type of water or process and not to plaintiff's brand or company.

7    Lastly, courts will also look to the trademark holder's own use of the mark to determine

8    genericness.  *Colt  Def. LLC v. Bushmaster Firearms, Inc.*, 486 F.3d 701, 707 (1st Cir. 2007);

9    *Rudolph,* 482 F.3d at 1198; *Retail Services,* 364 F.3d at 545.  This evidence is "relevant because '[a]

10   kind of estoppel arises when the proponent of [a] trademark use is proven to have itself used the

11   term before the public as a generic name." *Colt*, 486 F.3d at 707 (citing McCarthy § 12:13)

12   (alterations in original).

13   In *Colt*, the plaintiff used the term "M4" to describe a type of gun in a patent application and

14   summary judgment was accordingly granted in favor of the defendant.  *Id.*  Likewise, the *Retail*

15   *Services* court found the owner's use of the trademarked term in a generic sense important in

16   determining the validity of the mark.  *Retail Services,* 364 F.3d at 545.  There, the trademark holder

17   used the term "freebie" throughout its website to indicate something that a consumer is usually

18   charged for but receives for free.  *Id.*  For example, its website included the phrase "fabulous

19   freebies offered by your own special team" which the court found indicated that "freebie" was being

20   used generically.  *Id.*  In addition, the court looked at this use of the term and found it identical to the

21   use of the term on many other websites.  *Id.*

22   Plaintiff's use of the term "bottled at the source" is likewise inconsistent with its assertion

23   that the mark is not generic.  Defendant presents evidence of plaintiff using the phrase "bottled at the

24   source" on its own bottle in describing the product as well as in its advertising.  This includes

25   statements in advertisements such as "always bottled at the source to maintain the quality and

26   freshness of our natural spring water" and "our spring water is bottled at the source."

27   The court finds that defendant submitted undisputed evidence sufficient to overcome a

28   presumption of validity created by the registration of the mark.  The existence of a trademark

1  registration certificate is not *per se* sufficient to defeat summary judgment where defendant can

2  carry the burden of demonstrating that the mark is not entitled to protection. *See, e.g., Retail*

3  *Services*, 364 F.3d at 543. As discussed above, the evidence presented on summary judgment

4  includes dozens of competitors using the mark, the media using the mark as a reference to a type of

5  bottled water or a manufacturing process and plaintiff's own use of the mark in a generic manner.

6  This evidence clearly demonstrates that the mark is generic and therefore invalid. The defendant's

7  evidence is comparable or greater than similar cases like *Schwan's, Classic Foods, Colt, Retail*

8  *Services* and *Rudolph*.

9                    **2.    Secondary Meaning**

10         As an alternative ground for finding that "Bottled at the Source" is not a protectable mark,

11  defendant asserts that the disputed phrase is descriptive and lacks secondary meaning. A descriptive

12  mark is one that directly and immediately conveys some knowledge of the characteristics of a

13  product. 2 McCarthy § 11:16. It communicates about a product without requiring any imagination

14  on the consumer's part. *Surfvivor Media, Inc. v. Survivor Prod.*, 406 F.3d 625, 632 (9th Cir. 2005).

15  Even if a word describes only a single characteristic or property of a product, it can still be a

16  descriptive mark. *Meehanite Metal Corp. v. Int'l Nickel Co.*, 262 F.2d 765, 767 (C.C.P.A. 1959).

17  For example, Honey Baked Ham describes ham baked with honey. *Kendall-Jackson Winery*, 150

18  F.3d at 1047 (citing *Schmidt v. Quigg*, 609 F. Supp. 227, 226 (E.D.Mich.1985)).

19         Descriptive marks are not inherently distinctive and, without more, are not protected. *Id.*

20  But descriptive marks can sometimes acquire distinctiveness if consumers predominately associate

21  the mark with a specific producer, such that the mark acquires secondary meaning. *Id; see also Self-*

22  *Realization Fellowship Church v. Ananda Church of Self-Realization,* 59 F.3d 902, 910 (9th Cir.

23  1995) (a trademark that is descriptive and lacks secondary meaning is invalid).

24         Secondary meaning is an association in the public's mind between a product and its source.

25  *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 800-02 (9th Cir. 1970) ("Secondary

26  meaning has been defined as association, nothing more."). In order to determine whether a mark has

27  acquired secondary meaning, courts will look at the effectiveness of the producer's "effort to create

28  it, and the chief inquiry is directed towards the consumer's attitude about the mark in question: does

it denote to him a single thing coming from a single source?"  *Id.* (citing *Aloe Creme Lab., Inc. v. Milsan, Inc.*, 423 F.2d 845, 849-50 (5th Cir. 1970)).

Evidence of secondary meaning is established in many ways, including direct consumer testimony, survey evidence, exclusive use of the mark, manner and length of use of a mark, amount and manner of advertising, amount of sales and number of customers, established place in the market and proof of intentional copying by the defendant.  *Filipino Yellow Pages*, 198 F.3d at 1151 (citing 2 McCarthy § 15:30).

In *Filipino Yellow Pages*, the plaintiff presented evidence of secondary meaning with a declaration from the founder and president.  *Filipino Yellow Pages*, 198 F.3d at 1151.  The declaration stated that plaintiff had lost thousands of dollars in revenue because of confusion with defendant's product, but could offer no actual evidence of the purported confusion.  *Id.* at 1152.  The court rejected this, stating that "evidence of secondary meaning from a partial source possesses very limited probative value."  *Id.*

Similarly in *Self-Realization Fellowship Church*, the defendant presented evidence that members of the relevant public community did not associate plaintiff's mark with a single source.  *Self-Realization Fellowship Church*, 59 F.3d at 911.  Once the defendant had met its burden of proving the invalidity of the mark, the plaintiff failed to present sufficient evidence of secondary meaning to overcome summary judgment.  *Id.*  Plaintiff only offered testimony of its employees and wholesalers attesting that they associate the mark with plaintiff.  *Id.* at 910.  The Ninth Circuit concluded that this evidence had "very little probative value . . . to prove secondary meaning" and affirmed summary judgment for the defendant.  *Id.* at 911.

Although courts look to advertising and sales as evidence of secondary meaning, this evidence is not conclusive.  Naturally, a "large expenditure of money does not in itself create legally protectable rights."  *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 800 (9th Cir. 1970).  Secondary meaning is established by how effective the effort to create it has been.  *Id.* at 802.  In *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378 (9th Cir. 1987), the court found that plaintiff's advertising, although extensive, did not emphasize the mark in such as a way as to support an inference of secondary meaning.  *Id.* at 1383.  The court stated that the marketing did not

United States District Court
For the Northern District of California

emphasize this association in advertisements by, for example, "urg[ing] consumers to look for the 'familiar yellow jug.'" *Id.* Similarly, plaintiff's advertisements do not emphasize the mark as a distinct way to identify the producer of the product, which would be very difficult considering the mark's widespread use in the industry.

Lastly, although secondary meaning is a distinct legal principle from likelihood of confusion, they are often intertwined. 2 McCarthy, § 15:11. The Ninth Circuit affirmed a district court's recognition that "one of the indicia of secondary meaning is the likelihood of confusion among buyers." *Surgicenters*, 601 F.2d at 1018-19. In that case, there was no evidence of any consumer believing that the two businesses were related by way of misdirected mail or telephone calls and therefore no secondary meaning. *Id.* at 1091. The Ninth Circuit developed a non-exhaustive test to determine whether there is a likelihood of confusion in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). Courts look to the strength of the mark, proximity of the goods, similarity of the marks, evidence of actual confusion, marketing channels used by the parties, type of goods and the degree of care likely to be exercised by the purchaser, defendant's intent in selecting the mark and likelihood of expansion of the product lines. *Id.*

Defendant primarily attacks the presumption of secondary meaning created by the trademark registration based on the non-exclusive use of the mark. Mot. at 9-10. As discussed above, defendant presented ample evidence that the mark is used by media and other competitors without referring to plaintiff's company. This speaks to the *Sleekcraft* factors of the strength of the mark, evidence of actual confusion and the defendant's intent in selecting the mark. These factors weigh in favor of defendant's position.

Defendant also contends that secondary meaning must have been established at the time of infringement in 1997. Mot. at 9-10 ("Any presumption of secondary meaning does not apply in this case because the alleged infringing mark was in use prior to registration."). Plaintiff's argument – that the mark's registration creates a presumption of validity based on secondary meaning, even though the defendant infringed before registration of the mark – has been rejected by courts before. *Minn. Specialty Crops, Inc. v. Minn. Wild Hockey Club, LP*, 2002 WL 1763999 at *5 (D. Minn. 2002). In *Minnesota Specialty Crops*, the court emphasized that the mark was registered after

United States District Court
For the Northern District of California

1    initially being denied by the USPTO for a lack of secondary meaning. *Id.* at \*5. In cases where the

2    plaintiff asserts a presumption of validity, the court noted that "the timing of the effectiveness of that

3    presumption is critical." *Id.* (citing *Aromatique, Inc. v. Gold Seal*, 28 F3d 863, 869 (8th Cir. 1994)).

4    Continuing, the court stated that the "the presumption operates only after the registration becomes

5    effective" and since the alleged infringer was using the mark prior to registration of the mark, the

6    mark holder was therefore not entitled to any presumption of secondary meaning. *Id.*

7        In the present case, the defendant presents undisputed evidence that it has been using the

8    mark since 1997, five years before plaintiff registered the mark with the USPTO. As in *Minnesota*

9    *Specialty Crops*, since the defendant was using the mark prior to its registration, plaintiff is not

10    entitled to a presumption that the mark is valid. Indeed, in order to prove the validity of the mark

11    without this presumption "[t]he user must [ ] show that secondary meaning existed prior to the date

12    on which the defendant commenced using the same or similar mark." *Scott Paper Co. v. Scott's*

13    *Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3d Cir. 1978). Since plaintiff is not entitled to a

14    presumption of validity and defendant submitted undisputed evidence, some of which dates back to

15    1985, that the mark lacks secondary meaning, the mark is therefore invalid. *See id.*; Campbell Decl.,

16    Ex. F (picture from a 1985 book with Calistoga brand water bottle bearing phrase "Bottled at

17    Source" on label).

18        In addition, defendant asserts that confusion and therefore secondary meaning is very

19    unlikely since the trade dress between plaintiff and defendant is very dissimilar. Reply at 12-13.

20    Indeed, defendant's bottle has a tropical theme and is square in shape while plaintiff's bottle has an

21    alpine theme and is cylindrical. There is no likelihood of confusion that these two very different

22    products came from the same producer. Defendant also asserts that placing defendant's housemark

23    very close to the Bottled at Source mark makes confusion very unlikely. *Id.* at 16. Because, as

24    discussed above, defendant's evidence indicates that the mark is generic, that evidence is sufficient

25    to counter any assertion that the mark is descriptive with secondary meaning under the *Sleekcraft*

26    factors.

27        Plaintiff presents little evidence to overcome the determination that the mark is generic or at

28    most descriptive without secondary meaning. As discussed previously, plaintiff offers evidence of

**United States District Court**
For the Northern District of California

1    sales and marketing expenditures to establish the validity of the mark. Decl. Jordan Nelson ¶¶ 1-5

2    However, the Ninth Circuit has held that this is not determinative of secondary meaning. *Smith v.*

3    *Chanel, Inc.*, 402 F.2d 562, 568 (9th Cir. 1968) ("A large expenditure of money does not in itself

4    create legally protectable rights."). Descriptive marks without secondary meaning cannot be

5    trademarked and plaintiff's evidence only shows that it has spent money on advertising, not that the

6    public associates the mark with plaintiff. Plaintiff's evidence includes a declaration by Jordan

7    Nelson, the Purchasing/Brand Manager for plaintiff. Decl. Jordan Nelson ¶ 1. Mr. Nelson states,

8    without evidence other than marketing examples, that plaintiff's mark has acquired secondary

9    meaning. *Id.* He also asserts that this secondary meaning is in part due to plaintiff's "substantially

10   exclusive" use of the mark. *Id.* Mr. Nelson's unsupported statement that plaintiff's use has been

11   substantially exclusive is contradicted by the evidence presented by defendant that dozens of

12   competitors use the phrase "bottled at the source" as discussed previously. Also, because Mr.

13   Nelson is an employee of a party to this action, his interpretation of the mark's distinctiveness bears

14   "very little probative value." *Self-Realization Fellowship Church*, 59 F.3d at 911.

15       Plaintiff also asserts that there is a likelihood of confusion and therefore secondary meaning.

16   Looking at the *Sleekcraft* factors for determining confusion, plaintiff claims that its mark is strong,

17   the marks are identical, the parties are in direct competition, the defendant did not use the mark in

18   good faith, the parties use similar marketing channels and that there is a small degree of customer

19   care in choosing bottled water. Opp'n at 17-21. Plaintiff's arguments fail when examined in light of

20   the total evidence submitted. The undisputed evidence before the court shows that the mark is weak

21   and most likely generic or at most descriptive. Although the wording of the marks is similar, the

22   marks should be compared in the totality of the circumstances when determining a likelihood of

23   confusion. *Reno Air Racing Ass'n., Inc.*, 452 F.3d at 1137. Since the trade dress of the bottles is

24   markedly dissimilar and defendant uses the mark on the back label near its housemark, the marks are

25   not similar based on the totality of the circumstances. Although the goods are both bottled water,

26   there is no evidence of defendant's bad faith in using the mark other than its refusal to comply with

27   the plaintiff's cease and desist letter. Since defendant has shown that the mark is most likely generic,

28   its refusal does not indicate bad faith, particularly since defendant had been using the mark since

1   1997. *Id.* at 3.  Plaintiff's last claims that expansion of product lines and degree of customer care

2   weigh in favor of plaintiff are unpersuasive as well.  The differences in the products as a whole are

3   so striking that there is no likelihood of confusion.

4          Just as defendant provided sufficient evidence to establish that the mark has a primary

5   significance in referring to a type of bottled water and is generic, defendant has also sufficiently

6   shown that plaintiff's mark does not have the secondary meaning required for a descriptive mark to

7   warrant protection.  Looking at the totality of the circumstances, it is clear that plaintiff's mark has

8   no secondary meaning and that the likelihood of confusion with defendant's use of the mark is

9   negligible.

10          **B.**     **Trademark Infringement**

11          Alternatively, defendant argues that even if the mark is found to have secondary meaning and

12   therefore valid, its use is undisputedly within the bounds of fair use.  It is technically unnecessary to

13   discuss fair use since "[t]he fair use defense only comes into play once the party alleging

14   infringement has shown by a preponderance of the evidence that confusion is likely." *KP*

15   *Permanent Make-Up, Inc.*, 408 F.3d at 608-09.  As discussed above, the court has found that there is

16   no likelihood of confusion between plaintiff's and defendant's use of "bottled at the source" or

17   "bottled at source."  Nevertheless, the court will briefly address the parties' fair use contentions.

18          For the defendant to succeed with a fair use defense, the defendant's use "must not 'create an

19   improper association between a mark and a new product' but must, instead,  'merely identify the

20   trademark holder's products.'" *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1037-38 (9th Cir.

21   2007) (citing *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 806 (9th Cir. 2002)).  In the Ninth

22   Circuit, "a junior user is always entitled to use a descriptive term in good faith in its primary,

23   descriptive sense other than as a trademark." *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1151 (9th

24   Cir. 2002) (citing 2 McCarthy § 11:45).  The defendant must prove that its use of the term is not as a

25   trademark or service mark, that it uses the term "fairly and in good faith" and that it only uses the

26   term to describe its goods.  15 U.S.C. § 1115(b).

27          Defendant presents evidence that the mark is not used as a trademark, but as a factual

28   statement since its water is indeed bottled at a source in Fiji.  Mot. at 12.  The use appears to be in

United States District Court
For the Northern District of California

1  good faith since defendant understood and presented evidence that the term is widely used and the

2  mark is placed in small font on the back of the bottle.  *Id.*  Plaintiff contends that the defendant uses

3  the term as a trademark since it is used alone and not as part of a sentence.  Opp'n at 15.  But the

4  phrase "bottled at the source" or "bottled at source" can naturally be placed alone to convey

5  information to a consumer without it being considered a trademark.  Taking into account that it is an

6  actual description of the defendant's product and the manner in which it is used, there is no material

7  issue of fact as to whether or not defendant has a complete defense under fair use.

8          **C.**        **Plaintiff's Other Claims**

9          Plaintiff also asserts several other state and federal unfair competition, trademark dilution,

10  injury to business reputation, conversion, interference, false advertising, and negligent or intentional

11  misrepresentation claims based upon defendant's use of "bottled at source" on its labeling and other

12  advertising.  State and federal trademark infringement, unfair competition and dilution claims follow

13  essentially the same test.  4 McCarthy § 23:1.  Simply put, plaintiff must prove that it has a valid

14  mark and that there is a likelihood of confusion.  *Id.*; *Levi Strauss & Co. v Blue Bell, Inc.*, 778 F.2d

15  1352, 1354 (9th Cir. 1985).  Since the court has already determined that the mark is generic or

16  descriptive without secondary meaning, plaintiff fails the first prong of the test.  Additionally, the

17  court has also found that confusion is not likely and thus the plaintiff fails in the second prong of the

18  test.

19          Plaintiff's injury to business reputation claim likewise fails where it has no protectable

20  interest in the defendant's use of the mark.  Plaintiff's conversion claim similarly fails since the

21  plaintiff must own the property to assert a conversion claim and this court has determined that the

22  mark is not valid.  *Burlesci v. Peterson*, 68 Cal. App. 4th 1062, 1065 (1998).  Plaintiff's interference

23  claim fails because it has not shown any economic harm caused by defendant, among other criteria

24  for an interference claim.  *Blank v. Kirwan*, 39 Cal. 3d 311, 330 (1985).  Plaintiff's false advertising

25  and misrepresentation claims fail because, as stated previously, defendant's use of the phrase

26  "bottled at source" is a factual statement about its product.

27

28

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT—No. C-07-02258 RMW
NED

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**D.      Conclusion**

Based on the evidence presented of competitor's use, the media's use and the plaintiff's own use of the mark, the court concludes that defendant has overcome the presumption that the trademark "Bottled at the Source" is valid.  "Bottled at the Source" is generic and cannot be trademarked.  In the alternative, defendant has proffered sufficient undisputed evidence showing that "Bottled at the Source" is a descriptive mark that has not acquired secondary meaning and that there is no likelihood of confusion with defendant's use of the mark.  Plaintiff has not met its burden to show otherwise.  Because the court finds the mark to be invalid, plaintiff's other claims also fail.

**III.  ORDER**

For the foregoing reasons, the court grants defendant's motion for summary judgment as to all plaintiff's claims and on defendant's motion for summary judgment for cancellation of plaintiff's trademark.

DATED:      7/16/08                                        *Ronald M Whyte*
                                                                          RONALD M. WHYTE
                                                                          United States District Judge

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT—No. C-07-02258 RMW
NED

1   **Notice of this document has been electronically sent to:**

2   **Counsel for Plaintiff:**

3   Derek A. Eletich              derek@eletichlaw.com
    Yano Lee Rubinstein          yrubinstein@rublaw.com
4
    **Counsel for Defendants:**
5
    Mark D. Campbell             mcampbell@loeb.com
6   Sarah Catherine Abbott       sabbott@roll.com

7

8   Counsel are responsible for distributing copies of this document to co-counsel that have not
    registered for e-filing under the court's CM/ECF program.

9

10

11  **Dated:**    7/16/08                          /s/ MAG
                                            **Chambers of Judge Whyte**
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT—No. C-07-02258 RMW
NED                                                    18